The State of Nevada *v.* Kruttschnitt.

THE STATE OF NEVADA, Appellant, *v.* A. M. KRUTT-
SCHNITT *et als.*, Respondents.

Taxation of Proceeds of Mines. The constitutional provision, (Art. X) which
prescribes the taxation of "all property, real, personal, and possessory, ex-
cepting mines and mining claims, the proceeds of which alone shall be taxed,"
means that the entire annual proceeds of mines are subject to taxation, and not
the mere proceeds on hand when the assessor happens to visit the mines.

Ad Valorem Taxes Must Be Equal. All *ad valorem* taxes, whether on the
proceeds of mines or other property, must be equal.

Constitutional and Statutory Construction. Whenever the interpretation of
a statute or a constitution in a certain way will result in manifest injustice,
courts will always scrutinize the statute or constitution closely, to see if it will
not admit of some other interpretation.

Taxes on Proceeds of Mines Not Double. The provisions of the revenue
law of 1865, (Statutes of 1865, 271) for quarterly assessments on the pro-
ceeds of mines and quarterly payment of taxes do not impose more than a reg-
ular *pro rata* of taxation on the proceeds of mines, nor require the same prop-
erty to be paid for more than once.

Taxes on Proceeds of Mines Not Unequal. The quarterly payments of taxes
on the proceeds of mines, provided for by the revenue laws, are so arranged
that the annual proceeds of mines do not pay a larger *pro rata*, even as to in-
terest account, than if one annual tax for the annual proceeds were imposed,
payable at the time other annual taxes are payable.

Mines and Mining Interests Favored. The taxation of the proceeds of mines,
as provided for by the constitution and statute, is more favorable to mining in-
terests than if taxes were imposed directly upon the mines as upon other real
property.

Difference between Coin and Paper Currency. There is a difference of value
between gold coin and legal tender paper currency; it is recognized by the
general government, and should be recognized by legislatures and courts; and
as such difference exists in fact, it cannot be wrong to take notice of and be
governed by such fact.

Distinction between Coin and Currency for Taxation Purposes. The ac-
tion of the legislature in making a distinction between gold coin and legal ten-
der paper currency for the purposes of valuation of property for taxation, and
directing assessors as to the currency on which to base their estimates of value,
is not in violation of the laws of the United States.

Assessors Not Bound by Sworn Statements. Under Section 101 of the revenue
act of 1865, (Statutes of 1865, 307) assessors may call for sworn statements
of the amount and value of the proceeds of mines, but they are not bound by
such statements in making their assessments.

Construction of Revenue Law. The requirement in Section 101 of the revenue
act of 1865 that the value of the proceeds of mines shall be ascertained " as
provided in this act," has reference to the mode of allowance for the cost of
working.

ASSESSMENTS OF PROCEEDS OF MINES TO BE IN CURRENCY. Under the revenue law, as amended in 1867, (Statutes of 1867, 159) assessors must make all their estimates of the value of the proceeds of mines on the basis of legal tender paper currency.

AUTHORITY OF AUDITOR AS TO ASSESSMENT ROLL. The clause in Section 107 of the revenue act of 1865, requiring the auditor to ascertain that the assessments on the assessment roll comply with the sworn statements, etc., must be read in connection with Section 101 and other parts of the act, and does not authorize him to alter the assessments so as to make them conform to the sworn statements; its object was merely for the detection of errors in calculation and clerical mistakes in transferring the result of statements accepted as correct to the assessment roll.

STANDARD OF CURRENCY VALUE. The true standard of the difference between coin and legal tender paper currency, for the purposes of the valuation of the products of mines for quarterly taxation, is the average of the prices of currency for the preceding quarter.

ASSESSMENTS OF PROCEEDS OF MINES, HOW TO BE MADE. An assessment of the product of a mine made by an assessor under the revenue act as amended in 1867, (Statutes of 1867, 159) must give both the amount and value of such product; and if an assessor receives a sworn statement giving the product of a mine as bullion of a certain *value,* without stating the *amount,* it is his duty to treat it as the value in gold and add thereto a sufficient percentage to fix the paper money value; and if he omit to do so, he is derelict in his duty.

DEDUCTIONS FOR COST OF WORKING ORES. The deductions for the cost of working ores, authorized to be made for the assessments of products of mines under the revenue laws, are to be made on a legal tender paper currency basis, after the assessments are calculated to such basis.

IGNORANCE OF OFFICIAL DUTY NO EXCUSE. A person who undertakes any employment, and particularly that of a public office, must understand his duty, and he cannot be excused for want of knowledge.

MISJOINDER OF CAUSES OF ACTION. A cause of action on an official bond against the principal and his sureties cannot be united with a cause of action for damages against the principal alone.

JUDGMENT FOR OFFICIAL DELINQUENCY. A judgment for damages against an officer for official delinquency, which remains unsatisfied, will not prevent a subsequent action on the official bond.

BY LEWIS and JOHNSON, J. J. The revenue laws require the sworn statement of the product of a mine to show the amount of such product in weight, and not merely the amount in dollars; they require both the amount *and* value to be given.

APPEAL from the District Court of the First Judicial District, Storey County.

*R. M. Clarke,* Attorney General, and *Mesick and Seely,* for Appellant.

This was a suit against A. M. Kruttschnitt, County Assessor of Storey County, and Mathew Rapp, John Rapp, Leonard Lotterer and Jonas Pinschower, the sureties on his official bond, for alleged neglect of the Assessor in his official duty, with intent to defraud the State out of a portion of its revenues.

The first count of the complaint alleged, among other things, that the Assessor, for the purpose of making the assessment on the proceeds of mines for the quarter ending on the last day of June, 1867, demanded and received sworn statements of such proceeds, and ascertained therefrom that the produce of the mines in Storey County for that quarter, liable to taxation, was 140,394¾ tons of ore, and the value thereof, per ton, in legal tender paper currency, was $32.54 and upwards; yet that the Assessor neglected and refused to set down in the assessment roll either the value per ton or the total assessed value in legal tender paper currency of such product, or the full amount thereof in such currency after legal deductions; but set down the value of the product at much less, to wit: $10 in such currency less than its value, thus making the total aggregate valuation $1,403,950 less in such currency than he should have made it.

The second count of the complaint had reference to the assessment of products of mines for the quarter ending on the last day of September, 1867. It alleged that the product during that quarter, as ascertained by the Assessor from the sworn statements demanded and received by him, was 129,434 13-25 tons; that the Assessor did not ascertain or determine the value thereof in legal tender paper currency, nor set down or return to the Auditor, as required by law, the valuation in such currency; but knowingly and with intent to defraud the State out of a large amount of its revenue, assessed and valued the same one-third less than the value in such currency. The prayer was for judgment against the Assessor in the sum of ten thousand dollars, and against each of the other defendants in the sum of twenty-five hundred dollars.

In the case of the Savage Mining Company, the assessment roll showed—and the assessment roll was in the same form in respect to the other mines—that the product for the quarter ending in September, 1867, on which the deduction of $18 per ton was

allowed, was 27,005 tons of ore; that the value thereof per ton was $39.48; the total value, $1,066,157.49; and that the amount upon which the tax was levied was $580,067.40.

The sworn statement of the Savage Mining Company for the first quarter—and the other sworn statements were like it in point of form—was (omitting the oath) as follows:

### STATEMENT.

Original list of the Proceeds of the Savage Mine for the quarter ending June 30th, 1867.

Whole number of tons extracted from the mine for the three (3) months ending June 30th, 1867 . . . . . . . . . . . . . . 25,130 tons.

Whole number of tons extracted and worked by any process without roasting, exceeding in value $18 per ton. . 25,610 tons.

Whole number of tons extracted, and by the Freiburg process, or smelting process, exceeding in value $40 per ton . . . . . 41 tons.

Value per ton of ores worked by any process without roasting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $42.42.

Value per ton of ores worked by the Freiburg roasting or smelting process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $398.59.

Total value . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,102,718.39.

Whole number of tons sold (giving prices) . . . . . . . . . . . . . None.

It appeared on the trial, from the testimony of the Assessor, that for the quarter ending in June he had received the sworn statements of the superintendents of the various mines in the county, and being informed and believing that the values therein mentioned were according to a gold coin basis, had increased the amounts proportionably, so as to put them upon a legal tender paper currency basis, and that the tax was levied upon the latter basis. He testified that in the case of the Savage Mining Company there was extracted for that quarter 25,610 tons of ore, the value of which per ton, in gold, was $42.42; that the total value in gold, after deducting $18 per ton, was $635,396.20; and that the amount upon which the tax was levied, in currency, was $806,962.84.

The plaintiff then offered to prove that for the quarter ending in

September, 1867, the value of the ores raised and deposited on the surface from mines in the county was at least one-third greater in legal tender paper currency than in gold coin; that the Assessor knew this fact, and that the sworn statements received for that quarter were all made on a gold coin basis, and not according to results or values in currency. The defendants objected to all testimony and offers of testimony tending to prove such facts, on the ground that the same were irrelevant and not matters of judicial investigation, because the Court could not make or recognize any distinction between values of such ores in currency and other kinds of money; and further, on the ground that the sworn statements furnished by the superintendents of mines were conclusive and binding upon the Assessor and the State. The objections were sustained by the Court, and the proposed testimony ruled out, plaintiff excepting.

The Assessor further testified that he did not assess or value the product of ores for the quarter ending in September in legal tender paper currency, nor undertake to do so; that he received and accepted the sworn statements as conclusive upon him; and that he requested the superintendents rendering their sworn statements to inform him whether the amounts returned by them were according to gold or currency rates, which they declined, or at least did not do.

The defendants on their part offered in evidence the sworn statements, to which the plaintiff objected, on the ground that they did not show whether the values therein mentioned were in gold coin or legal tender paper currency, and were not valid statements without showing that fact. The objections were overruled by the Court, and the sworn statements admitted in evidence, plaintiff excepting.

The defendants also introduced in evidence the proceedings of the Board of Equalization in reference to the taxes on the proceeds of mines for the quarter ending in June, 1867, from which it appeared that the various mines had complained of the action of the Assessor in increasing the valuation for that quarter from a gold to a currency basis; and that after hearing the complaints and statements of the various parties interested, it was by the

Board of Equalization ordered " that the quarterly assessment roll of the proceeds of the mines for the quarter ending June 30th, 1867, be equalized by reducing the same to the amounts as given by the different companies in their statements, and that the Assessor collect the same in accordance herewith," etc.

The Court before which the cause was tried, a jury having been waived, rendered judgment for the defendants.

Before proceeding to discuss the particular points relied on in this case, it may not be improper to premise a few general remarks, in response to statements made by opposing counsel on the oral argument, in substance, that the tax sought to be enforced was unjust, and that the suit was prosecuted at the instance of State officials, in violation of the letter and spirit of the Revenue Law, and in violation of a compromise made between the mine-owners and the Legislature.

It is a sound principle of the government, that taxation shall be equal and uniform, and that each citizen of the commonwealth shall bear his just proportion of the public burthens. At the instance of the mine owners, and by their *intrigue* and *threats*, the Constitutional Convention so far sacrificed this just principle as to wholly exempt from taxation the mines, the most valuable, most productive, and most considerable property interest in this State—vesting in the Legislature the power to tax the proceeds alone.

When the first Legislature convened under the Constitution, the friends of equal taxation attempted, in conformity with the letter and spirit of the Constitution, to impose the same rate of taxation upon the proceeds of the mines as upon other property. But their efforts were met and thwarted by the same spirit of intrigue and *domination* that had procured the exemption of the mine itself; until in the face of the Constitution twenty dollars were deducted from the gross yield per ton, and a tax levied on seventy-five per cent. *only* of what remained. This effort was renewed in the Legislature of 1866, with similar results. In 1867, the burthen of taxation falling heavily upon the people, the treasury depleted, the State heavily in debt, with no power to borrow, and no credit to borrow on if the power had existed; when bankruptcy stared us in the face, and fears were seriously expressed respecting the

success and permanent existence of the State Government, the friends of equal taxation again attempted to impose taxation upon the proceeds of the mines in accordance with the provisions of the Constitution.

When the Legislature convened there was scarcely one of the fifty-four members who did not favor the proposition. Notice of intention to introduce the bill had scarcely been given, when a swarm of mine owners, mining superintendents and persons in their interest, besieged the Legislature with such determination and persistency as to prevent the passage of any revenue law during that session, *thus necessitating an extra session at a cost of twenty thousand dollars to the State.*

In the extra session the contest was again renewed by the employment of the same devices, and by resort to the same intrigue; until when the session was about to expire, the honest advocates of just taxation were again forced to sacrifice principle by an odious discrimination in limiting the tax upon the mines for county purposes to twenty-five cents on each one hundred dollars valuation, and deducting from the gross yield of wet-process ores eighteen dollars per ton—an amount largely in excess of the actual cost of reduction. This discrimination, so unjust to the general tax-payers of the State, and so partial to mine owners, *was accepted by the latter as a satisfactory compromise,* and it was hoped and believed this compromise, at least, would be observed in good faith. Let us see how it resulted.

To the surprise of the revenue officers of the State, and to the shame of the mine owners, in violation of the law and in breach of the compromise made, the mines refused to pay, and did not pay the tax levied for the quarter ending March 31st, 1867; but, on the contrary, insisted on paying, and did pay, under the law of 1866, thus wronging the State out of more than ten thousand dollars revenue. Still further, when the Assessor came to assess the proceeds of the mines for the quarter ending June 31st, 1867, notwithstanding the law required all assessments and valuations to be made in legal tender paper currency of the United States, the mining superintendents declined to make their returns of value in paper currency—made them in coin—and when the assessor, follow-

The State of Nevada *v.* Kruttschnitt.

ing the law and instructions of the Controller of State, added the difference between coin and paper currency, these same mine owners, through their attorneys, besieged the Board of County Commissioners sitting as a Board of Equalization, until, under pretense of equalizing the tax, they restored the valuation from.currency to coin, *thus defrauding the State out of one-third of her revenue for that quarter.*

And finally, these intrigues have culminated in this suit; in an effort to establish and justify a palpable evasion of the law, by which the State is permanently to lose one-third of her revenue arising from the taxation of the proceeds of mines. Surely, it illy becomes counsel representing the mines to cry out "injustice" and bad faith, and cast reflections upon officers of the State who, without compensation or personal interest, in the simple discharge of their sworn official duty, attempt to recover to the State *that which is honestly her own.*

## I.

Is the Revenue Act of April 2d, 1867, constitutional? So far as the Constitution of this State is concerned, this question is settled by the two cases of *The City of Virginia* v. *The Chollar-Potosi G. & S. M. Co.*, (2 Nev. 92) and *The State* v. *Estabrook*, (3 Nev. 173). In both these cases the constitutionality of the law was directly involved, and in each the Court expressly held the law constitutional. But it is said that the provisions of the law requiring "all assessments and valuations for taxation to be made in legal tender paper currency of the United States" is in derogation of the Act of Congress making Treasury notes a legal tender in payment of debts. Clearly, it is not against the *policy* of the General Government, because it is her distinctive policy to require all valuations for purposes of taxation to be made in legal, tender paper currency of the United States. Nor can it in any just sense be said to be a discrimination against Treasury notes, because it is an express recognition, both of the existence and validity of that kind of money, and because, furthermore, if it have any effect, it is to make that kind of money the basis of all kinds of commercial transactions of the State, introduce it into general circulation, and encourage its adoption as the basis of all commercial transactions.

13

If the act of the Legislature required the *payment* of taxes in any particular kind of money, it might be open to the charge of unconstitutionality ; but it does not.    The tax-payer is at perfect liberty to discharge his obligation in either of the two currencies.    Can it be said that a law, in perfect harmony with the policy of the Government, is void because of public policy ?    Can it be said that a law, which leaves the debtor at perfect liberty to pay in either kind of money, and which enacts  absolutely nothing upon the subject of " payment," or " tender," conflicts in any sense or degree with a law which provides that Treasury notes shall be a lawful tender in payment of debts, etc. ?

Again : there are two kinds of lawful money—coin and paper— each created and sanctioned by the same authority, and both legal tenders in payment of taxes.    All valuations must be made in the one or the other, because there is no other measure of value, and because it is impossible to make them in both.    If the Assessor make his valuation in coin, is the act void because a discrimination against paper ?    If he make it in paper, is it void because a discrimination against coin ?    If either proposition is true, both must be, and no legal assessment can be made.    Thus are we led to a logical absurdity, and forced to a conclusion that would render the collection of revenue impossible.    It requires no argument to prove that what the officer of the State may lawfully do, the State may lawfully require to be done.

## II.

Are the statements furnished by the superintendents of the mines conclusive as to the assessment and valuation of the proceeds of the mines for all purposes of taxation ?

It is the duty of the Assessor to list and assess all property for taxation, including the proceeds of the mines.    This duty is not shared with any other officer or person.    The superintendents of the mines are not assessors or officers of the State in any sense for taxation purposes.    Section 101 of the Revenue Law provides that " the County Assessor    *    *    *    shall ascertain and *determine* as provided in this Act, the number of tons and the *value per ton* of all ores, etc., and shall list and assess the same," etc.    Here is a clear duty imposed upon the Assessor.

To determine the value of ores he must act, and act for himself. The language necessarily imports responsibility—the exercise of judgment and discretion. The Assessor must do more than *list*, (that is, put down on the roll) he must also *"assess."* But to "assess" is to value. There can be no assessment without valuation. The term assess, in its ordinary as well as its legal acceptation, means to fix the value of property for the purpose of taxation. Nor is the force of this language at all weakened, or the argument at all impaired, by the words " as provided in this act." This phrase, which is directory merely, has reference only to the *manner* of listing and assessing, and in no sense relieves the Assessor from *determining* the value of ores. Interspersed with reference to other parts of the section it is susceptible of no broader construction than that the Assessor shall put down on the roll the name of the owner or company, description of the mine, number of tons extracted, value per ton *in paper currency*, and the total value *in paper currency;* and that as a source of information to him in order to enable him to *determine the value* of ores, he shall demand a statement not of the value of the ore—the thing required to be assessed—but of the value of the gold and silver bars or bullion received or produced   *   *   *   or the amount of money received from the sale of ores, etc.

The proceeds of the mines are taxed as ores or minerals, and not as gold and silver bars or bullion. (Statute of 1867, 160, Sec. 3.) It is the value of the ore or mineral when secured from the mine and deposited on the surface, and not the value of the gold and silver bars or bullion, that is to be determined by the Assessor. Ore at the dump, and gold and silver bars or bullion, are not more distinct than the duties imposed upon the Assessor and superintendents of mines. The former determines the value of the ore at the dump, and for the purpose of enabling " him to so determine," the latter is required to swear to the value of the " gold and silver bars and bullion " received or produced. By what process of reasoning can it be said that a statement containing the aggregate value of gold and silver bars or bullion received or produced from ores extracted from the mines for any given quarter, fixes or determines the specific value per ton of ores when deposited on the surface?

Clearly, unless it is the duty of the Assessor to fix and determine the value of ores for taxation, it cannot be done at all under the statute; for the law nowhere fixes it, and nowhere authorizes or directs any other officer or person to do it. So the Assessor is called upon to exercise his judgment. The statutes are not and cannot be conclusive, because *incomplete;* because they do not accomplish the thing required to be done by the law, viz: the ascertainment of the taxable value of the ore when deposited on the surface. The truth is, these statements are to aid the Assessor in the performance of his duty, as the Legislature have declared " to enable the Assessor to make such [his] assessment." Their purpose is to secure and increase the taxation of the proceeds of the mines, and not to open a door through which, by evasion and technicality, the mine owners could escape their just share of the public burthen.

It is undoubtedly true that much plausible argument may be drawn from the peculiar phraseology of Sections 107 and 123 of the Revenue Law of 1865. But these sections go not to the merit and substance of this controversy, and at most reflect but feebly upon the conclusions irresistibly drawn from the *letter* of Section 101, and the manifest spirit of the whole act. Besides, Section 107 is without sensible purpose; while both sections, and especially Section 123, are *directory* merely. " The complaint may be as follows" is the language of the law. Furthermore, if the legislation of 1865 and 1867 is inharmonious, the former and not the latter must yield. The apparent inconsistencies of the law, seized upon so eagerly, and urged with so much force and pertinacity by the counsel who represent the respondents, each and all find rational solution in the radical changes made in the financial policy of the State by the Legislature of 1867. The taxation provided by the Act of 1865 differs radically from that established by the Act of 1867. (Act of 1865, 306, 308, Secs. 90 and 106; Act of 1867, 159–160, Secs. 3 (90) and 4, (106.)

The Act of 1865 required all valuations and payments to be made in coin, whilst subsequent legislation requires all valuations, and permits all payments, to be made in legal tender paper currency of the United States. The haste and inattention of the Legis-

lature combined may account for their failure to amend such sections of the old law, as not being wholly inconsistent, were yet not in perfect harmony with the new.

It is submitted, that to make the Act of 1867 at all rational or consistent with itself, the position here asserted must be maintained by the Court.   How otherwise can legal effect be given to the last clause of Section 106, of the Act of 1867·?   Can it be possible that the Legislature intended to permit the mine owners to fix their own valuation upon the proceeds of the mines; make the value so fixed *conclusive;* and then to permit them to appear before the Board of Equalization to reduce the valuation so fixed by them below the standard of their own sworn statements?   Is there not a more rational conclusion to be drawn from this provision which renders the whole Act intelligible, consistent, and just?   And will not the Court follow this rational conclusion, rather than be drawn off into the region of obscurity, inconsistency, and absurdity?

## III.

If the statements contemplated by the statute are conclusive as to the value of ores for taxation, were the statements furnished such as are required by law, and do they excuse or justify the Assessor for failing to assess?

One thing is incontrovertible, viz: that " all assessments and valuations of property for taxable purposes shall be made on the value thereof in legal tender paper currency of the United States." (Statute of 1867, 159, Sec. 1.)   Whether it be the duty of the Assessor or superintendent of the mines to fix the value of·property for taxable purposes, and whether the value fixed in either case be or be not conclusive, it is made certain by the law that the valuation " shall be made   *   *   *   in the legal tender paper currency of the United States."   The Assessor or superintendent (as the case may be) who disregards this positive injunction, violates the law and defrauds the State out of her just revenue.   If it be held the duty of the superintendent to fix the valuation in legal tender paper currency, then his failure to do so is not a compliance with, but a violation of the law, and the statement defective in this important particular is no more the statement required by law than though it

failed to state the number of tons of ore. It is a palpable evasion of the statute, intentionally resorted to for the purpose of cheating the State out of one-third of her revenue; and if the Assessor accepts this, and treats it as a valid and sufficient statement by his act of acceptance, he becomes culpable, and in law responsible for the damage done.

The statement must be furnished to the Assessor. At least the responsibility of determining its sufficiency rests upon him. He is bound to know the law, and if he fail in the discharge of his official duty, to the damage of the State, either through ignorance or corruption, he must suffer the consequences.

An examination of the statements furnished the Assessor in this case will develop the fact that not alone in the particular of valuation does it come short of the statutory requirement, but in all particulars save one it does not show the "amount and value of all gold and silver bars or bullion received or produced," as required by law. (Statute of 1865, 307, Sec. 101.) But assuming the duties of the Assessor, and withholding from him the means provided by law to inform his conscience and enable *him* to "determine" the value, and putting the exercise of judgment and means of detecting fraud alike beyond the Assessor's reach, the superintendent relieves him from all trouble of arithmetical calculation—kindly substitutes *his* judgment for the Assessor's, and fixes at once the value of the *ores* per ton. This substitution of judgments is doubtless satisfactory to the mine owners, but that it is equally satisfactory and profitable to the State, I must be permitted to doubt.

*Hillyer and Whitman,* for Respondents.

I.

As an officer charged with a breach of official duty, the Assessor is entitled to a liberal construction in his favor of the law made for his guidance; and as sureties, the bondsmen are entitled to stand strictly on their contract. If the statute were susceptible of two interpretations, one of which would convict the officer of breach of duty, the Court should incline to the opposite construction, especially as in this case there is no doubt that the officer in good faith attempted to carry out the law.

## II.

The charge against the officer—the only one it is deemed necessary to notice—is, that having correctly ascertained and set down the number of tons for the quarter ending September 30th, 1867, he did not correctly ascertain and set down the value thereof in legal tender notes, but wrongfully set down the value at one-third less than it actually was in currency.

The proof is that the Assessor demanded and obtained from the superintendents the statements required by law, from which he ascertained the number of tons admitted to have been correct, and in which the values were stated, but without expressing the character of currency in which they were estimated; that the Assessor did not investigate the question of currency, but assumed that the statements were correct—as to value as in other respects—and made his values in the assessment roll accordingly.   It was attempted to be proved, also, that in fact the values were incorrect; but this evidence the Court below rejected as irrelevant in an action against the officer.

The question is whether the Assessor was guilty of a breach of official duty in not doing more than he did do towards ascertaining the value.   He is certainly not liable simply because that the *values may be incorrect.*   If an action could be supported on that ground, there would be no end to the amercements which might be imposed on an officer by an investigation of the *actual value* of the property upon his roll.   He must have neglected to do some material act toward its ascertainment enjoined upon him by law, or have willfully misstated the result.

## III.

The Assessor strictly observed the provisions of the statute.   We cannot agree with the counsel for appellant that the revenue law is, in respect to his duties, either incongruous or unintelligible.   It certainly establishes a system for assessing proceeds of the mines different from that prescribed for other property; but it is a system well devised and harmonious in its provisions.

The fundamental principle of the plan is that in regard to this species of property, the Assessor is not to use his own judgment or

information upon amounts or values, (except by way of penalty for willful misconduct) but is to be governed by actual records kept for him and presented to him by others.   Any other course than this is 'made totally impracticable by the nature of the property. At the time the assessment is made, it is not supposed to be in actual existence.   None of it can at that time be under the control of the person taxed, or open to the inspection of the Assessor, for it is only ores which have been *worked or sold* which can be taxed.

A law which should require in reference to this species of property an actual attempt at investigation of amounts and values by the Assessor, (except as a penalty, when it is supposed to be done at random, and without regard to real facts) would be open to sharper criticisms than that forced upon the opposing counsel by the disagreeable provision of the present statute.   The superintendent is to keep not an *estimate*, but an *account* of the *price* of the ores sold and of the *yield* of the ores worked.   It is a matter of mathematics and not of judgment.   This appears not in one section, but in many—permeating in fact every provision which touches the subject.

Sec. 101 provides that the Assessor shall ascertain by " diligent inquiry and examination" the name, location, etc., but the values and amounts, as *provided in 'this Act.*"   The same section requires that the superintendent shall give actual *yields* in his statement; not value of the ores, the property professed to be assessed, but value of *bars* and *bullion* and price of ores sold.

Sec. 102 says that " in case of the neglect and refusal," etc., the Assessor " may make an estimate."   And at the close, " and such assessment shall be as lawful, binding and effectual as if made upon a sworn or affirmed statement."

Sec. 3 of the Act of 1867, amending Sec. 99 of the original Act, requires that ores shall be assessed at their value, etc., but " *that to determine the value*" the Assessor shall deduct from " the gross yield," etc.   How is the Assessor to learn the *yield* except from a statement or record; and suppose that for any reason the yield and actual value varied, by which is the Assessor to be guided ?   This complaint does not charge that the roll does not contain the true results of deductions from yield, as directed to be

made by this section, but proceeds entirely upon the theory that it was the duty of the Assessor to value the ores, and that he did not give their value correctly.

Section 3 of the Act of 1867, amending Section 106, requires the Assessor to note "in the assessment roll" the fact of refusal to give a statement, and also makes a distinction as to what the assessment roll shall contain, as compared with the statement.

Section 107 requires that the statement shall go with the assessment roll to the Auditor, and that the latter shall "ascertain that the *assessments thereon entered comply with the sworn or affirmed statements relating thereto.*"

Section 123 provides that when the tax is not paid the complaint for its recovery shall state that the "ore, quartz, or mineral was assessed at ———— dollars per ton from the sworn or official statement furnished by ————."

Surely if the legislators did not intend that the statement should be conclusive, they showed a wonderful persistence in blundering into expressions plainly requiring it.

The provision that valuations shall be made in legal tender currency is, if applicable at all to this complete, distinct system of assessment of proceeds of mines, operative solely on the conscience of the mine owner. He, and not the Assessor, is responsible for its observance. Its sanction rests in those provisions which require his oath to the correctness of his statements of values as well as of amounts, and which attach the pains of perjury to a false statement.

## IV.

The document given by the superintendents to the Assessor was a statement within the meaning of that term, as held in the sections which speak of the "neglect or refusal to give a statement." To call a defective instrument no instrument is neither logical nor legal. To hold that if the statement given was incorrect, the Assessor should be held to act as if it had been refused, would be to throw the responsibility at last upon him instead of upon the superintendent, where the law places it. If this was neglect or refusal to give a statement, then the superintendents are liable to a criminal action, and the system of the law requires that the Assessor shall not be

authorized to impose the penalty of a random assessment only when the superintendent has laid himself liable to a criminal prosecution.

But the statement is not even defective. The only objection taken to it in the record is that it did not express upon its face that the values were in •legal tender currency. The law nowhere requires that the statement shall *express* the character of currency in which the values are stated. The forms prescribed in the Act do not require nor even permit that mention shall be made on the paper itself of the character of the currency.

## V.

If a statement was refused, then it was the duty of the Assessor to make an estimate. He had a right to do it in his own mode. He is not bound to accuracy of any character. If he assessed double the actual value, that recreant mine owner could not complain. Neither if he assessed too little could the State complain. He has chosen in this instance to be guided in this discretionary estimate by the informal figures of the papers given him by the mine owners. Nothing in the record shows that he had better means of information or intentionally made an erroneous valuation. He has complied with the law therefore, statement or no statement, and he is not liable, however *erroneous* may have been his calculation.

## VI.

The mode of assessment, under the doctrine of this Court that proceeds of mines are to be taxed like other personal property, operates with gross inequality and is therefore unconstitutional.

## VII.

A tax is a debt as soon as it is levied, and the Court had no power to inquire into the difference in value between dollars and cents in reference to fixing the amount of the tax.

*B. C. Whitman*, for Respondents, filed a separate brief, in which he said:

The Attorney General closes the argument upon the constitutionality of the Revenue Law touching the proceeds of the mines, so

far as regards the Constitution of this State, by the assumption that this Court has decided affirmatively in the two cases cited. Too much is claimed for the effect of these decisions; they only decide that any *mode* of valuation may be prescribed which tends to make such valuation a just and true one; but the statute is open to other objections. It so limits the discretion of the Assessor that there is in fact no opportunity for the exercise of judgment.

Whilst it nominally imposes only an annual *ad valorem* tax upon the proceeds of mines, it establishes an invidious distinction between such proceeds and other property, and in fact imposes a much more onerous tax upon them. It is special legislation as to that particular class of property. If the Constitution recognizes the proceeds of mines as "*sui generis*," and subject to special and peculiar legislation *ex necessitate*, then the objections urged are of no weight; but such does not seem to be the opinion of the Court, and therefore I claim that the objections are well taken.

What right has the Legislature of a State to make distinction between the lawful moneys of the United States? How can it say or intimate that one dollar differs from another? Any power the Legislature has it may in proper mode delegate. If then the Legislature may recognize a distinction between different kinds of lawful money, then it may authorize *citizens* to recognize such or any distinction they may choose to assume in their contracts. But this cannot be done. Where then the right in the Legislature?

The paper currency of the United States has "*per se*" no value but by Act of Congress; decided by this and other Courts to be constitutional, it is "lawful money." How can it be made by statute-action either greater or less? It is lawful money, dollars and cents, and for any Legislature to say that assessments and valuations shall be made in the "legal tender paper currency of the United States," is to say that they shall be made in lawful money, or in dollars and cents—convertible terms—or it is to attempt a distinction between different kinds of lawful money—between dollars and cents in paper and dollars and cents in gold. Either the language means nothing, or it means something "*ultra vires*" of State legislation.

If however such power exists, how can a uniform rate of assess-

ment and taxation be deduced from its exercise, unless the Legislature nominate a value for the legal tender paper dollar, which shall stand during the fiscal year? If the legal tender paper dollar is made more or less than a dollar, then the value must be fluctuating, and the property of A assessed to-day may have a very different valuation placed upon it from that attached to the property of B, equal in value, assessed yesterday or to-morrow. Difference will attach not only to time but also to locality, and this from no fault or error in judgment in the Assessor, but because the legal tender paper dollar is made more or less as the case may be at different times and in different places. It is impossible that assessment and taxation upon such a basis could be uniform or equal.

Admitting, however, that all assessments and valuations are to be made in legal tender paper currency, and that such language means that the assessment or valuation is to meet the varying value of the legal tender paper dollar estimated from a good stand-point, or upon some basis afforded by market prices, who, as to the pro-ceeds of the mines, is to make the calculation? The appellant would have the Assessor; the respondents, the party making the statutory statement. If the latter position is right, then there is an end of the case; for there is nothing in the record to show that the valuations were not so made, and the offer of proof upon the question is immaterial, as it is not accompanied with any offer or expression of intention to bring home knowledge of the fact to the Assessor.

If the valuation is, under the statute, to be made by the superintendent, then the Assessor is not responsible. If by the Assessor, then it, in connection with all the other elements of estimation as to the proceeds of mines, constitutes a *quasi* judicial act, and he cannot be held upon his bond for error in discretion, unless acting willfully or corruptly, and some cases go so far as to say not then. (*Carlsen* v. *Mayor of New York; &c.,* 1 Denio, 595; *Kendall* v. *Stokes,* 3 Howard, 99.)

The proof made in the case at bar was intended to show that the Assessor relied entirely upon the statements, and therefore utterly neglected his duty. If he relied upon the statements, he certainly

cannot be said (under the conflict of provisions of the statute admitted by the appellant) to have done so either willfully or corruptly. Respondents contend that the statute is so clear as to leave no room for doubt that the Assessor is absolutely bound to accept the statements as final and conclusive upon him; if however he could under the statute exercise his judgment—his discretion—he has done so by accepting the statement.   Shall he and his bondsmen suffer for an error in judgment ?

Says the Attorney General: "Admitting that the Assessor. is bound by statements legally made, the statements in proof are of no effect, because not in accordance with law."   Strange argument to come from the State !   Has the appellant been setting pitfalls for its citizens ?   By Section 24 of the Act of 1866, defining the duties of the State Controller, it is "the duty of the Controller to provide suitable forms of blanks and books, and furnish the Assessors and Collectors of each county with the same, in such form and manner as will best effect the object of the statute providing for the assessment and collection of the public revenues of the State."   The presumption is that the Controller has done his duty.   The fact, as I am informed, is in accordance with the legal presumption, and all the statements of proceeds of mines are made on blanks furnished by the Assessor, who obtains the same from the Controller of State ; and in this connection it may be remembered that when the law provides that a copy of the roll shall be furnished by the Auditor to the Controller, and the Controller is invested with almost plenary powers over all collectors, that there is no word of proof to show that any objection was ever to this day made by that State officer to the returns either of assessments or collections, or that the Assessor or his sureties were ever notified of any defect in either until suit brought.   So far as the case shows, the State by one officer, and that one its chief financial agent, purchases blanks which its law officer then pronounces incorrect, accepts the returns coming from the assessments made upon such blanks when filled, as statements, and then brings suit against an officer for willful misconduct in office.   I do not say that a State cannot act in such manner, but I must be allowed the remark that it is treatment hardly calculated to inspire the

The State of Nevada v. Kruttschnitt.

citizens whom it affects with any great amount of veneration for the institution. If, then, these statements do not meet the letter of the law, the only fair inference is, that they were so framed in good faith by the Controller "in order to best effect the object of the statutes." For such variance no blame can attach to the Assessor, mine owner, or superintendent. If then the statements are made out as per blanks furnished by the chief financial officer of the State, what objection is there to them ? That they do not show upon their face that the valuations are made in legal tender paper currency ? To this the answer is multifold : First—No such form is given by statute or by Controller. Second—In substance they do show the fact, as the affidavit declares under the sanctity of an oath that true values have been given, which must be inter-preted to mean the values required by law. Third—The State, by its officer, has accepted the assessment made on them without objection. Fourth—If defective, the remedy is against the person making them.

By the Court, BEATTY, C. J.

This was an action brought by the State of Nevada against the Assessor of Storey County, and his sureties on his official bond, for malfeasance in office in having failed to assess the proceeds of mines in Storey County for the quarters ending on the thirtieth of June and the thirtieth of September respectively, in the year 1867.

The complaint contains two counts. The first is for failure to perform his duty in regard to the quarter ending June 30th, 1867. On this count there was perhaps a failure on the part of the State to make the proofs correspond with the averments of the com-plaint. The proofs offered in support of this count were not such as to present any of the more important points that were involved in the trial of the second count. For this reason the whole argu-ment of counsel was directed to the rulings of the Court in regard to the second count. For the same reason we may, for the pres-ent at least, pass to the consideration of that count.

In regard to the second count this state of facts appears : The Assessor called on the mining superintendents for a statement of the yield, etc., of their several mines for the preceding quarter.

The State of Nevada *v.* Kruttschnitt.

They furnished him statements showing the whole number of tons worked during the preceding quarter—the number worked by wet crushing, and the number worked by Freiburg, roasting or smelting process. The statements also showed the aggregate gross yield of all the ores, and the estimated net value per ton of the ores worked respectively by wet and dry process. The Assessor then entered on his books the net or taxable value of the different classes of ores from this statement, without making any estimate of the difference in value of gold and of paper legal tender currency, and in fact without making any estimate upon his own judgment of the value of the ores. The plaintiff alleges as a breach of the Assessor's official bond, his failure to assess the value of the ores taken from the different mines.

The defendants contend, first, that the sole duty of the Assessor consists in procuring the proper statements from the mining superintendents of the result of the working of the several mines in his district for the preceding quarter, and entering those results in his book or list of assessments. That he cannot go behind these returns, or question these results. That he has no power to make any estimate for himself of any mine, except where there has been a refusal to furnish the proper statement by the mining superintendent.

Second—That even if he has the power to estimate for himself, he has not failed in his duty, or at least his failure has done the State no harm, for it is not denied that the statements copied by him in his assessment roll are correct in all other respects, except that they fail to distinguish in their valuation between gold and paper currency ; and this distinction he could not make without violating the laws of the United States.

Third—That the tax on mines as now assessed and levied is unconstitutional and void, and the Assessors cannot be held liable for having violated an Act which is void and inoperative.

We have stated in the three foregoing propositions, we think, the substance of the points made by defendants' counsel, (though not in their language) so far as it will be necessary to decide them in this case.

There are some minor points discussed in the briefs, which it will

not be necessary to notice, because the settlement of these three main points will dispose of the case.

We will discuss the points stated in the reverse order of their statement. We have already held that the section of the Constitution which forbids the taxation of the mines, but requires the taxation of the proceeds of the mines, means that the *entire* proceeds of the mines shall be taxed; not the mere proceeds which happen to be on hand at the particular time the Assessor may happen to visit the mine. We have also held that *all ad valorem taxes*, whether on the proceeds of mines or other property, must be equal. See *State* v. *Estabrook*, (3 Nev. 173) and *The State* v. *The Cal. State Telegraph Co.*, decided in the present term. To have held that the Convention meant, when it provided for the taxation of the proceeds of mines in lieu of the body of the mine, that only such portion of the proceeds should be taxed as happened to be on hand once a year, when the Assessor went to the mine to make his annual assessment, would have been equivalent to holding that mines and their proceeds were practically to be free from taxation. For as the proceeds of mines are worked from day to day and sent from the State about once a week, there would never at any one time be enough of the proceeds on hand to be worth taxing.

Since the decision of the case of *The State* v. *Estabrook*, there has been a decision of the Supreme Court of the State of California, in the case of the *People* v. *McCreery*, fully sustaining our views in regard to the equality of the *ad valorem* taxation. The Constitution of California and our own are, so far as this point is concerned, about identical in language, and the Supreme Court of that State, composed of five Judges, came unanimously to the same conclusion as this Court did on that point. Subsequently two new Judges came on the bench, and they, in a response to a petition for a rehearing, fully concurred with the rest of the Court, thus making seven California Judges concurring without a dissenting voice in the views expressed by this Court as to the necessity of equality in regard to the rates of taxation on all species of property subject to an *ad valorem* tax.

But we are told this interpretation of the Constitution is so un-

just and oppressive to the mining interest, that we should review our opinion, and if possible find some interpretation of that instrument less onerous and objectionable. We are even told if this harsh interpretation of the Constitution is insisted on, it may result in the mining counties repealing all law for the collection of taxes from the proceeds of mines. A regret was expressed on the argument of this cause, that the members of the Legislature from the mining counties had not defeated the entire revenue bill of 1867, rather than allow such oppressive taxation.

There can be no doubt but that whenever the interpretation of a statute or a constitution in a certain way will result in manifest injustice, Courts will always scrutinize the act or constitution closely to see if it will not admit of some other interpretation; for it is not to be supposed that any legislative body passes an Act for the purpose of doing a manifest wrong. Let us see, then, whether there is anything so manifestly wrong in the operation of this constitutional provision as we have interpreted it. With regard to *ad valorem* taxes on property, we believe it is by universal consent admitted that it is not unjust to make every species of property bear precisely the same rate of taxation. From this general rule there are sometimes deviations. But where there is such a deviation, it is usually upon the ground that there is some policy to be subserved thereby, not that the general rule would be unjust. If there is any exception to the general rule, it must be in favor of property which is either totally or in a great measure unproductive. On such property it is sometimes contended that it is unjust to impose taxes, because it produces no income or immediate benefit to its holders.

But we have never heard it contended that any species of productive property should, upon principles of justice, be excused from regular *pro rata* of taxation. Upon the several grounds that unproductive mines are of no certain value, were unable to pay taxes whilst they produced no income, and that it was impolitic to check mining development by taxing claims which paid nothing, the Constitution was so framed as to tax the proceeds of mines rather than the mines themselves. It will hardly be contended that the intention of this provision was to exempt *paying mines* from their regu-

14

lar *pro rata* of taxation.   We do not understand respondents as
arguing that paying mines should not so pay ; but they contend
the law and the Constitution as interpreted by this Court makes
them pay more than their just proportion.

First, they complain that the mine has to pay four times a year,
and other property is assessed only once.   But the miner does not
pay four times a year on the same property.   He only pays the
regular *pro rata* tax on the whole annual proceeds of the mine.   If
that tax was paid in installments every evening, making three hun-
dred and sixty-five separate and distinct taxes paid annually, it
would make the tax no greater than if all were paid at once.   The
tax is an *annual ad valorem tax* on the *whole proceeds of the mine*.
That it is paid in four quarterly installments instead of one annual
payment does not increase the burthen on the mine.   The only
possible difference it could make to the miner paying it in one or
four installments would be in regard to interest.   One who had to
borrow the money to pay his taxes would have to pay a little more
interest for the money if he paid one-fourth of them at the end of
each quarter of the fiscal year than if he paid the whole at the end
of the year.   But as the revenue law is arranged, the payment of
taxes on the mines for the first quarter of any fiscal year is not
due until say about the first of June, the second quarter the first
of September, and the third the first of December, and the fourth
the first of March following ; the average time about the middle of
October.   This is about the average time for the payment of the
annual taxes.   So the mines are not worse off on interest account
than other tax-payers.

Look at this in another light.   The mines pay on the products
of the mine in lieu of the mine itself.   Let us see if the annual
products of the mine are usually worth more than the mine.   We
will take the Savage for an example, as that for several years past
has probably been the most regular in its yield, and has perhaps
fluctuated as little in price as any of the mines.   For the quarter
ending the thirtieth of June, this mine yielded a taxable product
on gold valuation of say $640,000 in round numbers.   This would,
if the yield equalled this much for each quarter, be a little over
two and a half millions in gold subject to taxation.   But it is

believed that this was over an average yield. In bad weather and with bad roads, the amount crushed would fall short of this amount. Probably this mine has never yielded much over $2,000,000 gold valuation subject to taxation. When paying fair dividends, the value of the stock has ranged considerably above $2,000; probably the average has not been much if any less, and possibly more than $3,000 per foot gold valuation. The mine contains eight hundred feet. Eight hundred feet, at $3,000 per foot, would be two millions four hundred thousand dollars. So that even this mine, in its most prosperous condition and paying the largest dividends, hardly pays as much by paying on *all its products* as it would have to pay if it paid simply a *pro rata* tax on the body of the mine.

If the calculation was made on nearly any of the other mines, it would appear that the mode of taxation is more favorable to them than if they paid on the body of the mine. It will be seen, then, that the *paying mines* do not often pay more, generally hardly so much, as other property in proportion to their real value. Whilst they are non-paying, or producing no pay ore, they entirely escape taxation. The farmer, on the contrary, has to pay on the cash value of his land, although it may be entirely unproductive. So, too, the farmer pays not only on the land, but on the wheat and the other crops he raises on it.

But it is said the farmer only pays once in a year, and all the produce taken off his land in the mean time escapes taxation. All products of the farm are annual, and if the Assessor does his duty scarcely anything escapes taxation. If when the Assessor makes his estimate there is a crop of hay, grain, potatoes, or other vegetables growing on the land, it enhances the value of the land and should go into its general estimate of value. If such crops are severed from the land then they are, or should be, assessed as other personal property. Indeed it not unfrequently happens that the same article is assessed twice. Wheat, for instance, is assessed to the farmer, and the same wheat when manufactured into flour is assessed in the hands of the miller or merchant. These, however, are inequalities that no law can guard against. Certainly the taxes as fixed by the Constitution bear less heavily on the mines than on

any other interest in the State, whilst they are most able to pay and require the most protection from the laws, for it is well known that the amount of violence and crime is much greater in the mining than in the agricultural districts in proportion to population, and the State is put to heavier expense on account of the crimes committed in the mining counties. The man who can see only injustice to the mines in the Revenue Law as now framed and interpreted would never see anything but injustice in any system which required him to contribute his share to the public burthens. He would doubtless see much justice in a system that would excuse himself entirely, and throw all the burthens of supporting the State government on other classes.

We cannot see any force in the second point made by respondent. As long as three dollars in gold will buy as much as four in paper, it will be useless to say to persons possessing common sense that the two things are equal, or that Courts cannot distinguish between them. There seems to be some sort of vague notion that because the Government has made paper money a legal tender, it has attempted to make it equal in value to gold. But this is not so. If paper dollars were as valuable as gold dollars there would be no necessity of making them a legal tender. People would take them for debts without any law compelling them to do so. One great reason for making paper a legal tender was the great rise in the price of gold as compared with other articles. If the Government had not made paper a legal tender, gold under the panic and increased demand caused by the war would have risen greatly in value and the whole debtor class of the nation would have been ruined. The man who before the war had purchased a tract of land for $10,000, paid $9,000 down and gave a mortgage for only $1,000, would under the joint effects of an increased demand for coin, and a panic in the money market, have found himself unable to sell the whole for enough to pay the $1,000 mortgage. All civilized nations among whom the use of bank paper has been known, have occasionally been compelled to resort to some measure of this kind for the relief of the debtor classes.

But making paper money a legal tender for debts was not making it of the same value as gold, and nobody ever yet believed it

could be as valuable as gold until it was at the pleasure of the hold-er convertible into gold.    The difference in value exists.    It is re-cognized by the General Government in various' ways, and all Courts and Legislatures must also recognize and act on the existing state of things.    Suppose A has 100 bushels of wheat and B with-out authority converts it to his own use.    A sues for the wheat and proves by two witnesses the ownership in himself, the conversion by B, and that the wheat was worth $2.80 per bushel or $280.00 for the 100 bushels.    B introduces ten witnessess, who prove that the wheat was only worth $2.00 per bushel: can it be doubted for a moment that A would be allowed to cross-examine B's witnesses to show that the reason of the discrepancies in valuation was that de-fendant's witnesses valued the wheat in coin, whilst plaintiff's had valued it in paper currency.    And would not the Court in such case instruct the jury that they must take notice of the difference in value of the two kinds of currency, and assess the damages on a paper basis because the defendant would, as a matter of course, discharge whatever judgment was given against him in that curren-cy which was most easily attained, or in other words, the cheapest in the market?    If Courts failed or refused to notice the difference in the two kinds of currency, it would in many instances result in damage or loss. To take notice of and be governed by facts as they exist cannot be wrong.    There are two kinds of money of un-equal value.    To produce uniformity of assessment it was indispen-sable that the Legislature should direct Assessors as to the kind of currency on which they would base their estimates of value.    The Legislature has done its duty and Assessors must obey and respect the law.

Section 101 of the Revenue Act reads as follows:

" Between the first Monday in January and the first Monday in February, also between the first Monday in April and the first Mon-day in May, also between the first Monday in July and the first Monday in August, also between the first Monday in October and the first Monday in November, in each year, the County Assessor shall ascertain, by diligent inquiry and examination, the name, title, and location of all mines and mining claims in his county, from which gold and silver, or either, is extracted ; and also the names

of all persons, corporations, associations, companies, or firms, owning or claiming, or having possession or control thereof; and he shall then ascertain and determine, as provided in this Act, the number of tons and the value per ton of all ores, quartz or minerals extracted for reduction from the said mines or mining claims, as aforesaid, and shall list and assess the same to the person, firm, corporation, association or company, extracting the ores or minerals as aforesaid, or owning or having possession, charge or control of said mine or mining claim.    For the purpose of enabling the Assessor to make such assessments, he shall demand from each person and firm, and from the president, superintendent, treasurer or managing agent of each corporation, association, or company engaged in extracting minerals, quartz, or ores bearing gold and silver, or either, a statement, under oath or affirmation, of the total amount and value of all gold and silver bars and bullion received or produced from his or their mines or mining claim, from reduction of ores, quartz or minerals from his or their mines and mining claim, for the three months next preceding such demand of the Assessor; also the number of tons from which said amounts were received or produced; also the value and number of tons shipped from the State for the three months next preceding.    The books relating to or used in the transaction of the business of any person or firm, company, association, or corporation, engaged in extracting ores, quartz, or minerals bearing gold or silver, or either, for reduction, shall, on demand of the Assessor or his deputy, be open to his inspection.    If any person, superintendent, officer or agent shall neglect or refuse, on demand of the Assessor or his deputy, to give, under oath or affirmation, the statement required by this section, or shall neglect or refuse to give, on demand, access to the Assessor or his deputy to the books, as aforesaid, such person, superintendent, officer, or agent, shall be guilty of a misdemeanor, and shall be arrested on complaint of the Assessor or his deputy, and on conviction thereof, before a Justice of the Peace, shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, or by imprisonment in the County Jail for not less than twenty days, nor more than three months, or by both such fine and imprisonment."

This section requires the Assessor to ascertain, by *diligent inquiry and examination* the names of mines, and also requires him to *ascertain and determine, as provided in this Act,* the number of tons, value, etc., of ores.

For the purpose of *enabling* the Assessor to make such assessment he is authorized to call for certain sworn statements, and is also authorized to examine books, etc.   There is not a word in the section requiring him to be governed by the sworn statements any more than by the books.   There is no legal presumption that the sworn statements and the books may not disagree.   Indeed, it could only have been on the supposition that these sworn statements might be false, imperfect or fraudulent, that the power to examine books was given to the Assessor.   If the statements were to be conclusive, why give the Assessor power to go behind the statement and call for the examination of the books of mining companies ?   This part of the section means just what it says : that for the *purpose of enabling the Assessor to make a correct estimate* of the value of ores, he may call for certain evidence.  When that evidence is produced he must be governed by it as all persons are governed by evidence just so far as it is reasonable, consistent and not contradicted by other evidence of greater force or weight. But still it is only evidence and the assessment is the result of the *judgment* of the Assessor, founded on that evidence.   The requirement that the value shall be ascertained *as provided in this Act* evidently has reference to the mode of allowance for the cost of working.   In other words, the Assessor after having determined in his own mind the number of tons worked and the yield of those tons for the last quarter from the *best evidence and all the evidence before him or within his reach,* must then proceed to fix the assessed value by deducting from each ton worked $18 if worked by wet crushing, or $40 per ton if worked by any roasting or smelting process.   And under the amended law he must make all those estimates on the value of the ore in paper money, ascertaining from the best means within his reach the comparative value of coin and paper.   The language of this Section 101, taken in connection with Section 99 as amended in 1867, which directs that all ores shall be assessed at their value when severed from the mine and

deposited on the surface, and also directs the manner in which this value is to be ascertained by deducting the cost of the working from the yield of the ore, is too plain to admit of misconstruction. The first section of the Act, in language as plain as can be used, directs the valuation to be made on a paper currency basis.

But it is contended that Sections 107 and 123 show that it was intended that the sworn statements of the mining superintendents should be conclusive.

Section 107 provides that the assessment rolls, after being completed, shall be delivered to the Auditor who, among other things, shall ascertain that the assessments entered therein shall comply with the sworn statement—and when no statement has been furnished, that fact is noted—and that the proper calculations and additions shall be made to complete the assessment roll.

This section, however, does not authorize the Auditor to make the assessment roll conform to the sworn statement. It does not in fact authorize the Auditor to do anything but to make certain calculations.

No doubt the reason for requiring the Auditor to make this comparison was to detect any clerical mistakes that the Assessor might have made in transferring the result of these statements to his assessment roll. How these mistakes or errors were to be corrected the law does not point out. Probably the opinion prevailed that the Board of Equalization could do it. But as that Board only met once a year it is evident at least three quarters in each year could not be equalized. It is also evident that in framing this section the draftsman only had in view two methods of making assessment: the one from the sworn statements of owners or superintendents, etc., and the other in cases where there had been a refusal to give any statement.

And practically for long periods of time those might be the only kinds of assessments made. Probably no case ever has arisen, and for years no such case may arise, as to require an Assessor to go behind such sworn statement. But the power to do so is clearly given in Section 101, and the mere omission in Section 107 to direct how the Auditor shall proceed where that power is exercised by the Assessor cannot take away the power. The draftsman of

Section 10.7 simply omitted from that section a few words which were necessary to make it congruous with Section 101. This omission only made a verbal incongruity; it in no way affected the efficiency of the law. The duty of the Auditor in those cases where there was no clerical error was plain.

He had to carry out the assessment as made by the Assessor. If the assessment was based solely on the sworn statement, the Auditor must carry out the figures as made by the Assessor. If made as directed when no sworn statement was furnished, he must do the same. If based upon the result of the quarter's work as shown by the books of the mining company or any other competent evidence, he must do the same. Doubtless it was intended that in every case where the Assessor based his assessment on other testimony than the sworn statement it should so appear on his assessment roll.

In these cases, however, where the Assessor professed to base his assessment solely on the sworn statement, it was clearly made the duty of the Auditor to examine his calculations, to ascertain whether there were any errors in calculation, or clerical errors of any description. The greatest incongruity in this section is that it does not direct how errors that are detected are to be corrected. Probably the draftsman thought they might be corrected by the Board of Equalization, after being pointed out by the Auditor. Section 123 prescribes the form of a complaint, and the draftsman again seems to have thought that all assessments must be based on sworn statements, except in those cases where the parties refused to make statements. But this incongruity cannot take away from the Assessor the power clearly given in Section 101.

Sections 107 and 123 are both part of the old law as it stood in 1865, and have not been amended. Supposing now that they do show (and we only admit this for the sake of argument) that the Legislature of 1864–5 did intend the sworn statement should be final. Section 106, which was amended in 1867, shows far more clearly that the Legislature which amended the law that year *did not* contemplate the sworn statement should be final. It contemplated the Assessor should exercise his judgment, and from that judgment there should be an appeal to the Board of Equalization.

If the sworn statements of the parties themselves were to be conclusive, why allow an appeal to the Board of Equalization. To allow a party to fix his own taxes, without any power on the part of the Assessor to interfere with his estimate, and then allow the same party to appeal from his own estimate, would be absolutely absurd. This Section, 106, having been the latest amendment, must control any inference to be drawn from Sections 107 and 123.

The present Revenue Law, altogether a piece of incongruous patchwork, amended at every session of the Legislature in some sections, without making other sections conform to those amended, is still clear enough, and plain enough, as to the proper manner of assessing the products of mines. The most essential things in the assessment are these :

First—The ores are to be assessed at their value when severed from the mine and deposited on the surface. Second—All assessments are to be on a paper currency basis. · Third—The assessment is not to be made until after the ores shall have been worked and the bullion extracted, so far as ores are concerned, which are worked in this State. Fourth—To produce uniformity in assessment, the value of all ores on the surface shall be ascertained and fixed as follows : The Assessor shall ascertain what the ores from each mine for the preceding quarter did actually yield, and after having ascertained the true value in *paper money* of the actual yield, he shall deduct from the actual value of the yield eighteen dollars for each ton worked by wet process, and forty dollars for each ton worked by any roasting or smelting process, the remainder to be the estimated true value of the ore at the dump. To enable the Assessor to find out the yield of ore, he is authorized to require written and sworn statements from owners, superintendents, etc., and he is also authorized to have access to their books to satisfy himself in these respects ; and we have no doubt he may resort to any other legal evidence to satisfy his own conscience, where he doubts the truthfulness or correctness of these reports. Having ascertained the number of tons worked by wet and by dry process, and the gross yield, he must then ascertain the value of that yield in paper money. Exactly how he is to determine the difference in value between gold and paper money the statute does not point

out, but he must do that from the best lights he has before him. Practically there can be but little difficulty. The prices current in the daily newspapers show as nearly as may be the relative value of paper and gold. The average of these prices for the preceding quarter would be the true standard. Thus, an assessment is made in May, 1867, for the proceeds of mines for the first quarter of that year. The average relative value of gold and paper from the 1st day of January to the 31st of March, 1867, both inclusive, would be the proper standard by which to fix the value of the products of the mines for that quarter. The value must be fixed upon the comparative value of money when the mineral was worked, and not what it may be at the time when the assessment is made.

Taking these principles, let us apply them to this case and see what are the rights of the parties. The Assessor called for the sworn statements which the law authorizes him to call for. Those statements are required to show, first, " the total *amount or value* of gold and silver bars   *  *   produced." The sample of statements given, that from the Savage mine, (and all others are admitted to be like this) shows substantially the total amount and value of all bullion produced for the quarter ending June 30th, 1867, to have been $1,102,718, 39-100. This part of the statement is in conformity with the requirement of the statute, except it omits the word *amount*, and only uses the word *value* before the figures expressing the sum total. Then comes the direction that the statement shall show the moneys (meaning doubtless both the amount and kind of money) received from the sale of ores sent abroad. Lastly, the statement shall show the number of tons from which the several amounts have been received. In this case there was no ore sent abroad, so no question arises on this point. In regard to the number of tons worked, the statement shows distinctly what number were worked by each process. This is precisely what the statement ought to show. Then in addition to these statements (which are all that the statute requires) there is a statement of the value per ton of the ore worked by each kind of process. This is wholly unnecessary—at least this part of the statement has no legal effect. It may be and perhaps is quite convenient, but it is mere surplusage, so far as the statute is concerned.

The first item of this statement which we have noticed (though it seems last in order in the statement itself) is the amount or value of the whole quarter's yield. The statute says the statement shall show the amount *and* value. If the amount is shown it may be shown either in ounces and the fraction of an ounce, or in dollars and cents. By either expression you may show the magnitude, or in other words, the amount of a bar of bullion. Doubtless when we speak of bullion which, like all that is produced from our mines, is a mixture of gold, silver and baser metals, the most convenient method is to express its amount in dollars and cents. That *amount* means of course dollars in coin. It has no reference to its *value* in paper. Then if this statement had shown that the total *amount* of bullion received was $1,102,718.39, the most carping critic would not have questioned that it meant that value in gold and silver, and not in paper. The omission of the word *amount* and insertion of the single word *value*, when the statute requires both *amount and value*, leaves room for some carping criticisms as to what that value means. But we apprehend there is no substantial reason for doubt. The general, perhaps universal custom west of the Rocky Mountains, is to sell bullion, and to quote it at its value in gold. The general custom of all mines is to make their dividends in gold and not in paper. All their accounts and statistics are kept in gold. This is a part of the history of the country and known to all intelligent persons. Besides, the statement omitted to use the word *amount* which the statute expressly requires, and used only the words total *value*. This omission shows one of two things: that the superintendent who made out this statement (supposing him to have known the requirements of the statute, and we cannot presume that he was ignorant of the law under which he was acting) either omitted the word *amount*, supposing *value* synonymous therewith, or else omitted it as a device to evade his duty. If he treated the two words value and amount as synonymous, as we have every reason to believe he did, then the total value meant the total amount and value in coin.

Knowing the great responsibility of the position of mining superintendents and the necessity of the stockholders placing gentlemen of the highest character in such places of trust, we cannot for a

moment believe that any mining superintendent did or would resort to any trifling evasion in a case of this sort.   We think the superintendent used the word value as synonymous with amount, as is constantly the case in common conversation and newspaper reports. When a newspaper says a bar of bullion contains so many dollars, we all understand it means coin dollars, and not the value of so many paper dollars.   If we say a bar of silver bullion contains a hundred dollars, we mean it contains silver enough to coin two hundred half dollars at the United States Mint.   If we say of gold bullion it contains one hundred dollars, we mean it contains enough gold to coin ten eagles or five double eagles.   We think the superintendent so understood and so used the term.   And so using it, he gave just as definite an understanding of the *amount* of the bullion as if he had given the number of ounces of gold and ounces of silver contained therein.   And he gave it in more tangible and convenient form.   If he had given the return in ounces of silver of such a fineness, and ounces of gold of such a fineness, it would have required a long calculation on the part of the Assessor to have ascertained the number of coined dollars it would produce.   The only defect in this certificate is the slight oversight in omitting the words " amount and " before the word " value."

If, however—a supposition we are unwilling to indulge for a moment—the word amount was omitted as a device to evade the law, it was a very shallow one, and could not have deceived the Assessor or any other man of common understanding and acquainted with the language and common usages of the country.   It was the plain duty of the Assessor to have treated this statement as a statement of the total *amount* of bullion realized from the mine. To this amount should have been added a sufficient percentage to fix the paper money value.   From this gross amount should have been deducted $462,620, that is, $18 per ton on 25,610 tons, and $40 per ton on 41 tons.   This would have shown the amount subject to taxation.

We have simply taken the statement which was in the record as an example to show how the assessments should be made under the statute.   This particular statement was one given in July, 1867, for the preceding quarter.   For this quarter the Assessor did make

an assessment, and probably in good faith intended to perform his duty. He did reduce the returns in gold to a greenback basis. The only error he seems to have committed was that he deducted the eighteen and forty dollars (the cost of reduction) per ton, before the amounts were reduced to a greenback currency basis instead of after. In other words, he allowed eighteen dollars per ton in gold for wet crushing and forty dollars in gold for the fire process, instead of eighteen and forty in paper currency, as we understand the law. This may have been the result of a want of judgment. The State officer prosecuting this suit will of course have to be the judge whether, under such circumstances, it is proper to prosecute a suit against the Assessor. It is a principle of law, however, that one who undertakes any employment must understand his duty, and this Court cannot excuse him for want of knowledge.

In regard to the assessment for the third quarter, the case is very different. In that case there was a deliberate, premeditated violation of the law. The testimony of the Assessor himself in regard to the assessment for the second quarter of 1867 shows that he understood the law fully, and knew perfectly well what his duty was, except in one respect, and that was in making the eighteen and forty dollar deductions in coin instead of paper.

The proof offered by plaintiff was amply sufficient to show that the Assessor willfully refused to perform his duty, and should have been admitted. The judgment must be reversed and the case sent back for a new trial and further proceedings, in accordance with the principles laid down in this opinion.

The complaint, however, will certainly have to be amended before another trial. It seems that the bond given by the Assessor is only for $2,500 ; so this suit is brought, it would seem, on the bond against the sureties for that amount, but damages are claimed against the Assessor for $10,000. We know of no principle or practice by which a suit on a bond against A, B, and C can be united with an action for damages against A alone.

The plaintiff will have to elect to prosecute the suit against the principal alone for the whole amount claimed, or against the principal and sureties for the $2,500. The two actions cannot be united.

Of course, if the action is prosecuted against the Assessor alone, and a judgment obtained for official delinquency, this would not prevent a future action on his official bond, if the State were unable to collect the individual judgment.

LEWIS, J.

I concur with the Chief Justice in the views expressed by him upon the first proposition discussed, and in the conclusion at which he has arrived upon the last; but my interpretation of the law upon this point differs somewhat from the construction placed upon it by him. I am of the opinion that the statute requires the statement furnished by the mining superintendents to show the *amount,* that is, the amount in weight of the pure gold and silver extracted from the ores. The word "amount," as used in the law, certainly does not mean the amount in dollars, for that would simply be a statement of the value, and the statute requires both the amount *and* value to be given. The statute also declares that the value of the ores shall be ascertained by the yield of gold and silver, no account being taken of the base metals: hence it seems to me that when the statute requires the "amount" of gold and silver bullion to be stated, it means the amount in weight; and as the pure gold and silver only are taken into account, the weight of those metals only is to be given, and the weight of each should of course be stated. Thus, when a statement is made out, the Assessor may at once calculate the value per ton of the ores from the amount in weight of the gold and silver extracted therefrom. If the statement be made out in accordance with my views of what is meant by the word "amount" as used in the statute, it will never be necessary for the Assessor to look beyond the statement, for when the number of ounces or pounds of pure gold and silver is given, it becomes a mere matter of mathematical calculation for the Assessor to ascertain its value in paper currency. I am, however, inclined to believe that the statement is not conclusive on the Assessor even when made out in conformity with the requirements of the laws; at least it is not when, as in this case, the most essential part of it—that is, the amount of the gold and silver—is not contained in it.

The Court below therefore erred in excluding the evidence offered by the State to prove that the valuation of the ores was in coin and not in the paper currency.

I concur in reversing the judgment.

JOHNSON, J.

On the one point discussed by Justice Lewis, I concur in both the reasoning and conclusions as therein expressed. Upon the other points discussed by the Chief Justice, I concur in the conclusions attained and in the judgment of reversal.