State of Nevada *v.* Eastabrook.

## STATE OF NEVADA, Appellant, *v.* DANIEL E. EASTA-BROOK, Respondent.

Where property is in this State. at the time a levy is made thereon for taxes, the owner thereof becomes liable for the tax, although he may have removed the property before the value thereof is assessed.

The Constitutional provision, which requires "a uniform and equal rate of assessment and taxation," requires that all *ad valorem* taxes shall be at a uniform rate or per centage.  One species of property cannot be taxed at a higher rate than another.

The products of mines being subjected by Constitutional provision to taxation, in lieu of the body of the mine, the entire annual product must be subject to taxation at the same rate or per centage as other property.

The first section of the Revenue Law levies a State tax of one dollar and twenty-five cents, and authorizes a County tax not exceeding one dollar and fifty cents on each hundred dollars' worth of all taxable property in the State.  This is clearly in accordance with the Constitution.

Section 99 imposes on the products of the mines an annual *ad valorem* tax of one per cent. for State and County purposes—say one-half per cent. for each.  Whether this be held as a substitute for the tax levied in the first section, or as an addition thereto, it is equally void and unconstitutional.  Products of the mines can neither be taxed more nor less than other taxable property.

The Legislature may direct the manner of assessing property, so as to obtain a fair valuation.  This Court could only declare such a law unconstitutional where it was manifestly intended to evade the provisions of the Constitution rather than to effect a fair valuation.

That portion of Section 99 declaring that three-fourths of the value shall be subject to taxation, is manifestly unconstitutional.  The value once being ascertained, the whole is liable to taxation.

Section 117, being merely to carry out the unconstitutional part of Section 99, falls with it, and is void.

If a law be passed by the Legislature, constitutional in part but unconstitutional as to some of its provisions, that which is constitutional will be sustained, unless the whole scope and object of the law is defeated by rejecting the objectional features.

In this case, rejecting that part of the Act which is unconstitutional, there still remains a complete Revenue Law.

If Section 99 was the only section providing for the taxation of the products of the mines, the whole law would fall with that section; but as Section 1 provides for the taxation of all taxable property, (of course, including products of mines) the law is complete, leaving out Section 99.

The Tax Collector and other revenue officers should have disregarded the unconstitutional portions of this Act, and proceeded to collect the tax equally from all property under those provisions which are constitutional.  Any tax-payer, by a proper proceeding in Court, could have compelled such a proceeding.

One tax-payer cannot be allowed to escape payment of his taxes because the Collector has improperly failed to collect from another from whom taxes are due.

APPEAL from the District Court of the Second Judicial District, Hon. S. H. WRIGHT, presiding.

*R. M. Clarke,* Attorney General, and *S. C. Denson,* District Attorney for Ormsby County, for Appellants.

Section 1, Article X, of the Constitution, does not require the proceeds of mines to be taxed at the same *ad valorem* rate as other property. It requires other taxable property to be taxed at " a uniform and equal rate of assessment." The proceeds of mines are only required to *be taxed.* The language of some portions of that section does not apply to the proceeds of mines.

If " proceeds of mines" is included in the terms " all property, real, personal and possessory," this law is not unconstitutional, for Section 1 levies a tax on all such property, except that which is exempted by the provisions of the Constitution.

Section 5 of the Act defines certain terms, and says proceeds of mines shall not be considered as coming within the definition of personal property, but does not attempt to exempt such proceeds from taxation. When a statute assumes to state the effect of a certain provision, we must presume that *all* the effects intended are stated. (See *Bird* v. *Dennison,* 7 Cal. 307 ; *Lee* v. *Evans,* 8 Cal. 435 ; *People* v. *Whitman,* 10 Cal. 45 ; *Perkins* v. *Thornburgh,* 10 Cal. 191.)

A saving clause in a statute must be rejected when in conflict with the body of the Act. (See Kent's Com. 462–3, and note ; *Savings Institution* v. *Makin,* 23 Maine, 360 ; 15 Peters, 445.)

Sections 100 to 125 describe the mode of proceeding to collect the tax on the proceeds of mines, as distinct from the manner of collecting taxes on other personal property, but do not affect the amount or per centage of taxes to be collected.

Section 99 is not necessarily in conflict with Section 1. It should be construed as levying an additional tax to that provided in Section 1, rather as than exempting this species of property from the operation of the general and comprehensive language of the first

section. If it is so construed, then it exceeds the constitutional limit of taxation, and for this reason may be rejected, leaving Section 1 standing. (*Campbell* v. *Union Bank*, 6 How. Miss. 625.)

Courts should not declare a law unconstitutional for inequality, unless such inequality leads to gross injustice. (*People* v. *Coleman*, 4 Cal. 55 ; *Mayor, etc.,* v. *Chollar Potosi Co.*, 2 Nev. 87 ; *People* v. *Naglee*, 1 Cal. 252.)

A portion of this tax is due to Ormsby County ; as there are no mines in this county the respondent could not be injured, so far as his county taxes are concerned, by a failure of the Legislature to make a constitutional law for the collection of taxes from the mines. The collection of a tax from the proceeds of mines in other counties would not reduce the respondent's *county* taxes in this county.

*P. H. Clayton,* for Respondent.

The property attempted to be taxed in this case was a mere debt or chose in action. It followed the person of the creditor, and was not within this State after respondent removed to San Francisco, on the sixth of April, 1866.

The law declaring the existence of a lien on all property for taxes to exist from first Monday in April, does not affect this case, for there can be no lien where there is no debt or tax due. The property was gone before the time of assessment for taxes arrived.

The Revenue Law is unconstitutional and void, because the proceeds of mines are only taxed to the extent of one per cent. for both State and county purposes, whilst the other property is taxed at one and a quarter for State, and one and a half for county purposes.

Opinion by BEATTY, C. J., LEWIS, J., concurring.

This was an action brought in the name of the State against the defendant for taxes alleged to be due the State and County of Ormsby for the year 1866. The property upon which the tax was levied consisted of certain choses in action or debts due to defendant.

The defense is two-fold : First, that defendant removed from the State of Nevada on the sixth day of April, 1866 ; that the chose in action followed the person of defendant, and therefore was not

taxable in this State after that date ; that the assessment of the property was made after the sixth of April, and was therefore void, and conferred no right of recovery on the plaintiff.

The second ground assumed in defense was, that the ninety-ninth section of the Revenue Act of 1864–5, as amended in 1866, discriminates in favor of the products of the mines, levying a smaller per centage of taxes on them than on other property ; that, for this reason, the tax on other property was in contravention of that Article of the Constitution which requires all taxation to be equal and uniform.

We will examine these points in the order in which we have stated them. The law levying the taxes for the year 1866, was approved February 24th, of that year. The first sentence of the first section of that Act is in these words :

" An annual *ad valorem* tax of ninety-five cents upon each one hundred dollars' value of taxable property is hereby levied, and directed to be collected and paid for State purposes, upon the assessed value of all taxable property in this State, not by this Act exempt from taxation."

Another sentence reads as follows :

" And upon the same property, the Board of County Commissioners, in each county, is hereby authorized and empowered to levy and direct to be collected and paid annually, an *ad valorem* tax for county purposes, a sum not exceeding one hundred and fifty cents on each one hundred dollars' value of taxable property in the county."

Section 2 of the Revenue Act requires the County Commissioners to make their levy for county purposes, prior to the first Monday of April in each year.

Section 3 declares that a lien shall attach on the first Monday of April in each year, upon all taxable property then in the State. These clauses seem clearly to declare that all property in the State when the law was passed, and which should remain there up to the first Monday of April, should be liable to taxation. There can be no question that the Legislature has a right to tax property belonging to its own citizens, and remaining a portion of the year within its jurisdiction. The citizen could not avoid the payment of the

State of Nevada *v.* Eastabrook.

tax by removing the property after the tax was levied.  Respond-
ent, however, claims that this property is to be held exempt, not
because it was removed from the State before any levy was made,
but before there was any assessment thereof.  The Revenue Act
requires the County Assessors to make their assessments between
the second Monday of May and the second Monday of September,
in each year.  But this, it appears to us, is wholly immaterial.
The tax was *levied* prior to the sixth of April, when defendant left
the State.  From the moment of the levy there was a duty or
obligation imposed on the owner of the property to pay a certain
per centage of its value to the State for taxes.  The removal of
the property from the State before the value thereof was ascer-
tained by the Assessor, might render it more difficult in some cases
to ascertain the real value of the property, but could not release
the owner from his legal liability to pay the tax when the amount
thereof was once ascertained.  We think that the property, having
remained in the State after the first Monday in April, was clearly
liable for both State and county taxes.

The tenth Article of the Constitution reads as follows :

" The Legislature shall provide by law for a uniform and equal
rate of assessment and taxation, and shall prescribe such regula-
tions as shall secure a just valuation for taxation of all property,
real, personal and possessory, excepting mines and mining claims,
the proceeds of which alone shall be taxed, and also excepting such
property as may be exempted by law for municipal, educational,
literary, scientific, religious or charitable purposes."

The first phrase to which our attention is called is this : " A
uniform and equal rate of assessment and taxation."  We have no
hesitation in saying that the Constitutional Convention, in using the
language last quoted, meant to provide for at least one thing in
regard to taxation : that is, that all *ad valorem* taxes should be
of a uniform rate or per centage.  That one species of taxable
property should not pay a higher rate of taxes than other kinds of
property.  If the language we have quoted did not express this
idea, then it was perfectly meaningless.  The language used may
mean much more than this, but it cannot mean less.  The Consti-
tution clearly intends to provide against that species of injustice

which frequently prevails in communities where there is one over-shadowing interest: the exemption of the property connected with that interest from its legitimate share of the public burdens.

It is a part of the history of the State known to every intelligent man within its borders, and frequently alluded to in the Constitutional debates, that at the time we were about to frame our State Constitution, those most largely interested in mines insisted they should be exempted from all taxation; that the Constitution should provide for their exemption so as to set this question at rest for at least a series of years. This exemption was claimed for several reasons: one, that the mines gave life and energy to all other kinds of business; that the prosperity of all other business depended on the success of the mines. Another, that mining claims, especially before they were so far developed as to be productive, were of too uncertain a value to admit of a fair valuation for taxation.

On the other hand, the population of the State settled in the agricultural portions thereof asserted that the mines constituted the great portion of the wealth of the State, and that it was highly unjust to relieve them and throw the whole burden of taxes on those counties which were poorest and least able to pay. The result seems to have been a compromise of the extreme views of each party, which is very clearly expressed in the Constitution, and embraces two main propositions: First, that all property assessed for an *ad valorem* tax should be liable to pay the same per centage; second, that unproductive mines should be entirely free from taxation, whilst those which were productive should pay the regular *ad valorem* tax on the products, instead of the same tax on the body of the mine itself. There can be no doubt but it was the intention that the entire product should be taxed, in lieu of the body of the mine. This property is different from all other property in the State. Whilst the products of farms remain in the State until consumed, being generally subject to at least one taxation per annum, the products of mines are removed from the State at the end of each week; so that it is seldom that more than the fiftieth part of the products of any of the principal mines is in the State at one time. Taking these views to be correct, (and we

think there can be no reasonable doubt that they are so) let us look at the sections of the Revenue Law complained of, and see how far they conform to or are in conflict with these views.

The first section of the Revenue Act levies an annual *ad valorem* tax for State purposes of $1.25, and authorizes a County tax of $1.50 on *all taxable property* in the State. This is clearly in accordance with that clause of the Constitution which requires "a uniform and equal rate" of taxation. This section seems in every respect unexceptionable. Section 99 imposes on the products of the mines an annual *ad valorem* tax of one per cent. for State and County, say one-half per cent. for State purposes, and an equal amount for County purposes. This clause can receive but one of two constructions: it was either intended to fix the entire rate of taxation for the products of mines at $1 on the hundred for State and County purposes, in lieu of the $2.75 fixed for other property; or else, as is contended by appellants, it is really an additional tax on mining products of one per cent. over and above the ordinary tax imposed on other property. In either event, the clause is equally void. The Legislature could neither make the tax greater nor less on the products of mines *than* on other property. Then follows, in the same section, a clause directing the manner of assessing the products of the mines. That clause is in these words: "All of said ores, quartz, or minerals shall be assessed as follows: From the gross return or assessed value per ton of all ores, quartz, or minerals from which gold and silver, or either, are extracted in this State, there shall be deducted the sum of twenty dollars per ton." This clause merely points out the method of finding what is the true value of the ores, which are the primary products of all mines.

We have no doubt the Legislature may direct the method of assessing property, provided the object is to attain a *just* valuation. This Court could not declare any law directing the mode of assessment void unless it manifestly violated those principles of justice which are required by the tenth Article of the Constitution. We see nothing objectionable in this clause. The closing sentence of Section 99 directs a tax to be levied on three-fourths of the value, previously ascertained, of the proceeds of the mine. This is clearly

unconstitutional. The value once being ascertained, the whole value is taxable at the same rate as all other property.

Section 117 of the Revenue Act, which provides for distributing the one per cent. tax directed to be levied by Section 99, falls, of course, with the opening clause of the last mentioned section. We see no constitutional objection to any other portion of the law.

The question then remains, whether the unconstitutionality of the opening and closing clauses of Section 99, and of the whole of Section 117, destroys the validity of the whole Act; or can the other portions of the Act stand, rejecting these portions which are in contravention of the Constitution ?

No principle can be better settled than this : that if a law passed by the Legislature be constitutional as to part of its provisions and unconstitutional as to others, the unobjectionable portion may stand, if by rejecting that which is unconstitutional, the whole object and effect of the law is not destroyed. In this case we may reject all that part of the Act which is in conflict with the Constitution, and have a perfect and complete revenue law. If by rejecting that part of Section 99 which we hold to be in violation of the fundamental law of the State, the products of the mines were left free from taxation, this would vitiate the entire law; for it would have the effect of compelling one portion of the citizens to pay more than their due share of the State burdens.

The first section of the Act levies a tax on all taxable property in the State. That includes the proceeds of mines as well as other taxable property. Other sections direct the method of assessing this kind of property ; and if the assessors and tax collectors had only done their duty, disregarding these unconstitutional provisions entirely, the whole tax could have been collected.

That the mines—which constitute the greater part of the wealth of the State—have for the last two years almost entirely escaped taxation, is true. That the failure to collect the due proportion of taxes from them has greatly embarrassed the State, and thrown a heavy burden on that portion of our population least able to bear it, is equally true. But whilst the mines have escaped their share of the public burdens, through the fault and neglect of the assessors

and collectors, it would certainly not be promoting the ends of justice to excuse one-third or one-fourth of all the other tax payers in the State from the payment of their taxes, thus further increasing the burdens of those who have paid their taxes without suit.   Such a ruling would neither be in accordance with law, with justice, or public convenience.   Tax payers who did not wish to be overburdened by the payment of more than their share of the State expenses should have taken steps to compel the assessors and collectors to do their duty.   There can be no doubt the Courts would have afforded relief.   Having failed to do this, no tax payer can be allowed to set up the illegal conduct of these officers as a defense to an action brought against him for his taxes.

In the case of *Exchange Bank of Columbus* v. *Hines,* 3 Ohio State Reports, 1, the same constitutional questions arise as in this case, and the Court arrives at the same conclusions as ourselves. The principal opinion (written by Chief Justice Bartley) is a very clear exposition of the law bearing on the constitutional branch of this case.   It is so ably and clearly written that we have thought it hardly worth while to go into a more lengthy discussion of the points involved.   We refer to that opinion, as expressing our views more clearly than we ourselves could express them.

The judgment of the Court below is reversed, a new trial granted, and the cause remanded for further proceedings.

Having been counsel, JOHNSON, J., did not participate in this decision.