## Case No. 4,924.

### FORBES v. GRACEY et al.

[Trans. Rec. U. S. Sup. Ct. Oct. Term, 1876, p. 11,967.]

Circuit Court, D. Nevada. April 26, 1877.[1]

HILLYER, District Judge. This is a motion made on behalf of the complainant [Charles Forbes] for an interlocutory injunction restraining the defendant [Thomas] Gracey from collecting and the other defendants [the California Mining Company, John W. Mackay, and James G. Fair] from paying the tax laid upon the proceeds of the California mine for the quarter ending June 30, 1876. The motion was made upon the bill, and the defendant Gracey shows cause against it by a demurrer and an affidavit touching the equities of the bill. The bill alleges that the complainant is an alien and a stockholder in the California Company; that that company is a corporation organized under the laws of California, and that Mackay and Fair are citizens of Nevada; that said corporation is in possession of the "California Mine," but has never purchased it, and the title is still in the United States. It then refers to the compact in the Nevada enabling act not to tax or interfere with the disposition of the public lands, and quotes at length the law of Nevada taxing the net

[1] [Affirmed in 94 U. S. 762.]

proceeds of mines. It states that the defendant Gracey is assessor of Storey county, and has assessed the ores taken from said mine against the said company for the second quarter of 1876 and a tax upon them of $72,852.03; that he has demanded and still is demanding from the defendants, Mackay & Fair, superintendents of said company and its agents at Virginia City, the said tax, and that said Gracey "has" threatened and still threatens and is about and will, unless restrained, seize property of said company and sell it to satisfy the tax; that the tax is one collected every three months, and is a continuing grievance; that the defendant Gracey is irresponsible for the amount of any one quarterly tax, and his bond is for only $40,000; that the Nevada tax law unjustly discriminates against the mines; that the tax and assessment are invalid and illegal, because at the time the assessment was made the yield of the mine had not then become "proceeds" and because the yield for that quarter, at the time the assessment was made was not within the state of Nevada, but had been exported therefrom; that Mackay and Fair are about to and will pay the said tax unless restrained. The bill next alleges the notice given by complainant to the corporation of his interest as a stockholder of the tax and its illegality, and his demand that the corporation institute suit to test its validity, and his protest against the payment of the tax, and the refusal of the corporation to comply; that he sues for other stockholders who shall, in due time, come in, and he is entirely remediless, except in a court of equity.

The demurrer is upon several grounds; those urged being that the complainant has a complete and adequate remedy at law, and there is a total want of equity in the bill; that there is a nonjoinder of necessary parties plaintiff, because all the stockholders should have been joined; that there is a defect of parties defendant, because the directors should have been made defendants and Mackay and Fair should not have been.

Upon the argument the point was made that a stockholder cannot maintain a suit of this kind, although the rights of the corporation are involved and the board of trustees refuse or decline to take the proper steps to assert them. But this point is settled authoritatively in favor of the right of the stockholder to sue, under the circumstances mentioned, by our supreme court. Dodge v. Woolsey, 18 How. [59 U. S.] 331; Davenport v. Dows, 18 Wall. [85 U. S.] 626. And see Huntington v. Central Pac. R. Co. [Case No. 6,911]. And, while the corporation must be made a party to the bill, it is held unnecessary to make the directors parties in such suit when no relief is prayed against them. Heath v. Erie Ry. Co. [Id. 6,306], and cases there cited; Davenport v. Dows, supra. So it seems equally well settled that the suit can be maintained without making all the other stockholders parties, at least if the suit is brought by one for the benefit of all. It is no longer doubted, says our supreme court, in Dodge v. Woolsey, "either in England or the United States, that courts of equity have a jurisdiction over corporations at the instance of one or more of their members." Winch v. Birkenhead, L. & C. J. Ry. Co., 13 Eng. Law & Eq. 506. Mackay and Fair are alleged to be the agents of the corporation of whom payment of the tax has been demanded, and about to pay the alleged illegal tax, unless restrained. Under these circumstances they seem to me to be proper, though, perhaps, not indispensable parties to the bill. I consider none of the objections made to the parties in the bill well taken.

The next point raised by the demurrer is that the complainant has an adequate remedy at law, and that there is no fact stated in the bill authorizing the interposition of a court of equity. It is admitted that the illegality of the tax and the threatened sale of property for its payment constitute, of themselves alone, no ground for such interposition. The rule is that "there must be some special circumstances attending a threatened injury of this kind distinguishing it from a common trespass, and bringing the case under some recognized head of equity jurisdiction before the preventive remedy of injunction can be invoked." Dows v. Chicago, 11 Wall. [78 U. S.] 108. The "special circumstances," which give a court of equity jurisdiction, may be such as require the aid of the court by injunction to prevent or remove a cloud on complainant's title, to prevent a multiplicity of suits, "or to prevent any injurious act by a public officer for which the law gives no adequate redress." Carroll v. Safford, 3 How. [44 U. S.] 459; Dow v. Chicago, supra; Huntington v. Central Pac. R. Co., supra. Does the law furnish this complainant with adequate redress for the injury which he sets out in his bill? As this case is now presented upon bill and demurrer, it appears, for the purposes of a decision on this point, that the defendant corporation is about to pay, and will pay unless restrained, an illegal tax, and that the corporation refuses to bring any suit or take any steps to test the validity of the tax or resist its collection. It may, then, be granted that the corporation itself, in case it saw fit to proceed, would have complete legal redress, either by paying the tax under protest and suing to recover it, or by an action of trespass or replevin against the officer seizing property to satisfy it without granting that this complainant has any such legal redress within his reach. For the very gist of his complaint and the main ground upon which he stands in a court of equity is that the corporation is about to pay the illegal tax, and refuses to use its legal remedies; and nothing can be clearer than that the stockholder has no such direct legal interest in or right to the property of his corporation as enables

him to sue in a court of law for an injury to that property. The legal right to the property taxed is in the corporation, and according to all legal rules an action for an injury to that right must be brought by the corporation. Where, then, is the stockholder's legal redress? He himself cannot sue to enforce the rights of the corporation without making it a party defendant, so that it may be bound by the judgment. Davenport v. Dows, supra. So, too, ordinarily in a suit like this, all the other stockholders must be made defendants, or the suit be brought, as in this case, for their benefit. The case is one of equitable cognizance in every aspect. It has been held that where the state laws made no provision for suit against the state, and a portion of the tax, when collected, was paid into the state treasury, the plaintiff was left without any adequate relief at law, and might enjoin the illegal tax. First Nat. Bank v. Douglas Co. [Case No. 4,799]. The state of Nevada has no law authorizing suits against it, and its portion of the taxes when collected is paid into the county treasury for the use and benefit of the state, and is paid over to the state treasurer whenever that officer and the comptroller order it to be done. 2 Comp. Laws Nev. pp. 209, 218, 219. If it should be admitted that the stockholder can sue either the trustees or the corporation at law for the misappropriation of the corporate funds to the payment of an illegal tax, then every other stockholder can sue, and this leads directly to a multiplicity of suits.

Upon this question I am of opinion that the bill in this case does state the special circumstances which bring the complainant's case within the recognized heads of equity jurisdiction, taking it for granted that the tax is illegal, as the bill states.

The remaining points are to the merits of the case made by the bill. The first one is, whether the tax upon the proceeds of the mine—the mine being a part of the public domain—is a tax upon the mine itself, so far as to be a violation of the compact contained in section 4 of the Nevada enabling act, "that no taxes shall be imposed by said state on lands or property therein belonging to the United States," or an interference with the power of congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. Numerous authorities were cited by the complainants, establishing beyond all question that congress has the entire control of the public lands; that it may sell or give them away; that so long as the United States remains the owner they cannot be taxed by the state; that when the lands have been sold or donated, and the certificate of entry of the land officer has been given, the government holds the naked legal fee in trust for the purchaser, who then has the equitable title, and the lands are then, and not before, subject to state taxation, although the patent has not issued. Witherspoon v. Duncan, 4 Wall. [71 U. S.] 210. A very forcible argument has been made by complainant's counsel against the power of a state to tax—as is done in California and Nevada—the value of improvements on or of possessory rights to the public lands within the state. In the view I have taken of this case, however, I do not find it necessary to decide that question. The tax complained of in this case is not nominally a tax on the improvements or possessory right, but a tax on the proceeds of the mine, or, in the language of the statute, "on the ores and mineral-bearing material of whatever character" extracted from the mine. These ores are assessed quarterly, in the mode provided by statute. Such a tax, it is agreed, is in effect a tax on the mine, which is the property of the United States, just as a license tax on the importer was held to be a tax on imports. Brown v. Maryland, 12 Wheat. [25 U. S.] 419. Courts, it is said, should and will look through names and forms to the substance and reality; and hence, if this burden does really fall upon the mine, it is none the less illegal because levied in the name of a tax on the ores extracted. All this must be conceded. But the state is only prohibited from taxing the lands or other property of the United States, so that if it be found that the United States has in fact parted with all its interest in the ores taxed, this case is taken out of the rule laid down in Brown v. Maryland.

The policy of congress touching the public mineral lands as found in its legislation, is, in some important respects, different from that touching other public lands, and to my mind has an important bearing on the main questions involved in this case. This difference in policy springs from the diversity in the two species of property. The beneficial occupation and enjoyment of mineral land requires the destruction of the estate—the taking away of all there is in it of value. Agricultural land, on the contrary, in the course of proper husbandry, increases in value with time and its profitable use and enjoyment. A moment's inspection of the mining laws will show that congress, while retaining the naked legal title in the United States, has in fact parted with all that is valuable in the mines. By section 2322 of the Revised Statutes of the United States, it is provided that "the locators of all mining locations * * * on any mineral vein, lode, or ledge situated on the public domain, their heirs and assigns, * * * so long as they comply with the laws of the United States, and with state, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their location, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines," etc. And by

section 2324, upon the failure of any one of several co-owners to contribute his proportion of the required expenditures, after notice published, "his interest in the claim shall become the property of his co-owners." And in section 2332, liens which have attached to a placer claim before patent are not to be impaired by the issue of the patent. The practical effect of this legislation is to confer on the mining locator and his assigns something more than a pre-emption right. The locator acquires under it an exclusive right of possession, which he can transmit to his heirs and assigns, and this possession continues so long as the laws are complied with. His "possessory title" is recognized, and the state laws regulating it also, if not in conflict with the laws of the United States. In short, under this law the locator has a valuable possession of and property in the mine, and may lawfully take out and appropriate all the valuable ores and mineral therein; that is to say, all there is of value in the estate. What more would a patent secure to him? Practically nothing. Indeed, it is common knowledge in this state that the right secured by the locator under this law is regarded as of about equal dignity with a patent, and, in some instances, as the preferable title to a mine. It seems to me indubitable that the ore extracted by a locator or his assigns is his property, as absolutely as if the government had clothed him with a perfect legal title to the mine; and it is impossible for me to see how a tax on this ore so granted to the miner is a tax on the lands or property of the United States. In McCullough v. Maryland, 4 Wheat. [17 U. S.] 415-436, the supreme court, while holding a tax on the operations of the bank unconstitutional, said that the opinion did "not extend to a tax paid by the real property of the bank in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland held in the institution." I cannot perceive that a tax upon the real property of the bank would not as nearly be a tax on its operations as a tax on the proceeds of a mine. The proceeds, being the property of the miner, is a tax on the mine. So in the Railway Tax Cases, 15 Wall. [82 U. S.] 232, although it was held that a tax of so much per ton on freight carried from one state to another was a tax upon transportation, and therefore a regulation of commerce forbidden by the constitution, yet it was laid down "that the gross receipts of railroad or canal companies, after they have reached the treasury of the carriers, though they may have been derived in part from the transportation of freight between states," had become subject to legitimate taxation. It was submitted, too, that this tax would ultimately increase the cost of transportation. Is this tax on the proceeds of the mine any more a tax on the mine than a tax on a railroad car or on the gross receipts is a tax on transportation? I think not. Yet both, in some degree, perhaps, approach taxation admitted to be unlawful. If, then, I have rightly conceived the import and effect of the mining law, and it does operate as a virtual transfer to the locator of the entire property in the ores extracted, it must follow that a tax on those ores is neither a tax on the property or lands of the United States nor any interference unwarrantably with the disposition of the public lands, and that the complainant's objection to it is not a valid one.

It is next to be determined whether the property taxed was within the jurisdiction of the state when it was taxed. The bill states "that at the time said tax assessment was made, the yield of said California mine for the said second tax quarter of the year 1876 was not within the state of Nevada, but had been exported therefrom, nor was the owner of such yield, to wit, the California Mining Company, then within the state of Nevada, or then or ever a citizen thereof, or a resident therein. This is not denied, but the answer to it is that the property taxed, though out of the state at the time of the assessment, was within it when the tax was levied. The course of taxation of this species of property is as follows: By the general revenue law an annual ad valorem tax of 125 cents upon each 100 dollars value of taxable property is levied for state purposes upon the "assessed value" of all "taxable property in this state," including the proceeds of mines and mining claims. 2 Comp. Laws, § 3125. The manner of assessing the proceeds of mines is as follows: It is the duty of county assessors to compare and complete quarterly, on or before the second Monday in February, May, August, and November in each year, a tax list or assessment roll of the proceeds of mines "in their respective counties for the preceding quarter." The assessment is made upon ores extracted and reduced or sold during the quarter preceding the assessment. The value of the ore is ascertained by deducting from the gross yield or value of the total number of tons extracted and reduced or sold during the quarter the cost of extracting, transporting, and reducing or selling the ore. Act Feb., 1871; 2 Comp. Laws, p. 225. By section 6 of this act of 1871, it is provided that "every tax levied under the authority of the act shall be a lien on the mine from which the ores are extracted, which shall attach on the first days of January, April, July, and October of each year. The facts may be stated thus: During the quarter ending June 30, 1876, as shown by its own statement, the net yield or value of the ores extracted by the California Mining Company for that quarter was $3,736,000.46. The assessment was made upon this valuation, but made after the expiration of the quarter, and after the bullion obtained by the reduction of the ores had been exported beyond the state.

The ores taxed are taken out and reduced in this state during the quarter. The California Mining Company is a non-resident.

Under these circumstances, is the tax on the proceeds legal? Was the property taxed so, within the jurisdiction of the state during the fiscal year, as to be a proper subject of taxation? For if it was, the power of the state as to mode, form, and extent of taxation is unlimited unless restrained by provisions of the constitution of the United States. State Tax on Foreign-Held Bonds, 15 Wall. [82 U. S.] 300. State taxation may touch property within its jurisdiction in every shape—in its natural condition, in its manufactured form, and in its various transmutations. Id. "The protection of the government," says Mr. Cooley, "being the consideration for which taxes are demanded, all parties who receive or are entitled to that protection may be called upon to render the equivalent. But a personal tax cannot be assessed against a non-resident, neither can the property of a non-resident be taxed unless it has an actual situs within the state, so as to be under the protection of its laws." Cooley, Tax'n, 14. For some purposes personal property is said to have no situs, and, in the absence of positive law in the place of its location, its transfer is regulated by the law of the domicil of the owner. Story, Confl. Laws, § 383. But for the purpose of taxation it may have an actual situs district from the domicil of the owner. People v. Commissioners of Taxes, 23 N. Y. 224. In the case of ores extracted by the California Company it seems to me clear that there is a time during the quarter for which they are taxed when they have an actual situs in this state for the purpose of taxation. That is during the time, after they are taken out of the mine, that they are undergoing the process of reduction, and until, at least, the bullion produced by such reduction is carried out of the state. As a subject for taxation they have no other situation. During that period they are protected in Nevada, and may be taxed and regulated by that state. This being so, is it indispensable that the bullion obtained from the ores taxed should be within the state at the time the assessment roll was made up? The complainant insists that it is, but the defendant Gracey says that it is sufficient if the property taxed is within the jurisdiction of the state at the time of the levy of the tax. By the revenue law of Nevada it is provided that an annual tax "is hereby levied and directed to be collected and paid." Boards of county commissioners are authorized to levy a tax for county purposes each year. As the word is used in this revenue law, the levy of a tax seems to be nothing more than a declaration by the legislature or the board of commissioners of the amount of tax which shall be assessed and collected for a given year. Strictly, however, a levy is the raising of a tax, and includes its assessment, collection, and paying over. If the levy of the tax does bind property, it is immaterial, for the purposes of this case, whether it takes effect on the first day of January, which is the first day of the fiscal year, or on the first day of April, as seems to be the judgment of the supreme court of Nevada, because that is the day when the lien for taxes attaches each year (State v. Eastabrook, 3 Nev. 173), or on the first day of each quarter, as to the proceeds of mines; for, in either case, the levy of the tax now in question, in the sense of the Nevada revenue law, was made before the property taxed was removed from the state and county. But be this as it may, I am constrained to uphold the validity of the tax and of its assessment for the following among other considerations: The provision of the legislature levying and fixing the rate of the tax, the assessment of property on which the tax is imposed, its collection and payment over to the treasurer, are all a part of one thing, directed to the accomplishment of one object—which is raising revenue for each fiscal year. The property taxed must be within the jurisdiction of the state during the fiscal year, it is true; but it is not, it seems to me, essential that it should be so situate at every stage of raising the tax. The property once where the state has a right to tax it for any given year or quarter, I cannot see that the power of the state to tax necessarily depends upon the length of time it remains there. The right to tax having attached, the state must be the judge of the mode to be employed for its taxation; with that the courts have nothing to do. "It is not for us," says the supreme court of the United States, "to suggest in any case that a more equitable mode of assessment or rate of taxation might be adopted than the one prescribed by the legislature of the state; our only concern is with the validity of the tax; all else lies beyond the domain of our jurisdiction." Delaware Railroad Tax, 18 Wall. [85 U. S.] 206–231.

The objections to this assessment seem to me to be to the mode rather than to the right of assessing. Whether the assessor shall attend each day at the mine and assess the ores as they reach the surface, or follow them to the reduction works and there assess their value, or shall wait, as prescribed by the existing law, until the expiration of the quarter, and then assess the value from sworn returns made to him by the officers of the company having the necessary knowledge of the facts, are but different modes of ascertaining the value of the property subject to taxation during the quarter for which it is so assessed. If the assessment were laying the tax it would be difficult, indeed, to sustain the present tax. But it is not so. The word assessment as used in the Nevada revenue law means determining the value of property subject to taxation, and is made after the tax is laid and the rate of it

fixed. It being true, as I think it is, that there was a time during the second quarter of this fiscal year when the state had jurisdiction to tax the proceeds of the California mine by reason of their actual situs here, it may take any mode consistent with its constitution for assessing the value and collecting the tax. The mode pursued in this case has been held by the supreme court of Nevada to be both "uniform" and "equal" in the sense of those words as used in the constitution of Nevada. This decision I am bound to accept as conclusive. The same is to be said of the uniformity and equality of the rate of the tax. State v. Kruttschnitt, 4 Nev. 178. The limitation on the power of the state to tax beyond that found in its constitution and laws is that the property shall be within its jurisdiction, and this I have found to be the fact here. The rule to show cause is discharged, and the temporary restraining order is dissolved.

The case of this same complainant against the Consolidated Virginia Mining Company, Thomas Gracey, John Mackey, and James G. Fair, is one involving the same questions as the foregoing, and was argued at the same time. A like order is to be entered in that case.